IN THE CIRCUIT COURT OF ESCAMBIA COUNTY, FLORIDA

| | |
|---|---|
| **NAN MORGAN McCARTNEY**, ) | |
| ) | |
| *Plaintiff*, ) | **JURY TRIAL DEMANDED** |
| ) | |
| v. ) | Case No.: _____ |
| ) | |
| **MYERS INDUSTRIES, INC.**; ) | |
| **SCEPTER US HOLDING COMPANY**; ) | |
| **SCEPTER MANUFACTURING, LLC**; ) | |
| **SCEPTER CANADA INC.**; ) | |
| **WALMART INC.**; and ) | |
| **WAL-MART STORES EAST, LP**, ) | |
| ) | |
| *Defendants*. ) | |

## COMPLAINT

COMES NOW Plaintiff Nan Morgan McCartney, who alleges the following facts, asserts the following causes of action, and seeks the following compensatory damages against Defendants Myers Industries, Inc.; Scepter US Holding Company; Scepter Manufacturing, LLC; Scepter Canada Inc.; Walmart Inc.; and Wal-Mart Stores East, LP.

### I. PARTIES, JURISDICTION, AND VENUE

1. Plaintiff **NAN MORGAN McCARTNEY** (hereinafter "McCartney") is a competent adult resident citizen of Escambia County, Florida.

2. Defendant **MYERS INDUSTRIES, INC.** is a corporation created pursuant to the laws of the State of Ohio that has its principal place of business in Akron, Ohio. Its registered agent for service is CT Corporation System which can be served at 4400 Easton Commons way, Suite 125, Columbus, Ohio 43219. On July 2, 2014, Myers Industries, Inc. completed the acquisition of Scepter Corporation (the predecessor of Scepter Canada Inc.) and Scepter Manufacturing, LLC.

3. Defendant **SCEPTER US HOLDING COMPANY** is a corporation created pursuant to the laws of the State of Ohio that has its principal place of business in Akron, Ohio. Its registered agent for service is CT Corporation System which can be served at 4400 Easton Commons way, Suite 125, Columbus, Ohio 43219. Scepter US Holding Company is a wholly-owned subsidiary of Myers Industries, Inc.

4. Defendant **SCEPTER MANUFACTURING, LLC** is a limited liability company created pursuant to the laws of the State of Delaware that has its principal place of business in Miami, Oklahoma. Its registered agent for service is The Corporation Trust Company, which can be served at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Scepter Manufacturing, LLC is a subsidiary of Myers Industries, Inc.

5. Defendant **SCEPTER CANADA INC.** is a Canadian corporation that has a principal place of business in Scarborough, Ontario. Its registered agent for service is CT Corporation System (Canada), Ltd., which can be served at 400-1565 Carling Avenue, Ottawa, Ontario K1Z 8R1, CANADA. Scepter Canada Inc. is a wholly-owned subsidiary of Myers Industries, Inc.

6. Defendants Myers Industries, Inc.; Scepter US Holding Company; Scepter Manufacturing, LLC; and Scepter Canada Inc. are collectively referred to herein as "Scepter."

7. Defendant **WALMART INC.** is a corporation created pursuant to the laws of the State of Delaware that has its principal place of business in Bentonville, Arkansas. Defendant does substantial, continuous, and systematic business in the State of Florida, including Escambia County, and it is registered to do business in the State of Florida. Its registered agent for service is CT Corporation System, which can be served at 1200 South Pine Island Road, Plantation, Florida 33324.

2

8. Defendant **WAL-MART STORES EAST, LP** is a limited partnership created pursuant to the laws of the State of Delaware that has its principal place of business in Bentonville, Arkansas. Defendant does substantial, continuous, and systematic business in the State of Florida, including Escambia County, and it is registered to do business in the State of Florida. Its registered agent for service is CT Corporation System, which can be served at 1200 South Pine Island Road, Plantation, Florida 33324.

9. Defendants Walmart Inc. and Wal-Mart Stores East, LP are collectively referred to herein as "Walmart."

10. Defendants have purposefully availed themselves of the privilege of conducting business activities with the State of Florida by placing their products, including the portable fuel container at issue in this matter (hereinafter "subject container"), into the stream of commerce and by advertising their products and establishing retail facilities within the State of Florida.

11. Defendants derive substantial revenue from goods sold and used in the State of Florida.

12. Defendants do reasonably expect, or should reasonably expect, that their business activities could or would have consequences within the State of Florida.

13. Defendants have established continuous and systematic contacts with the State of Florida sufficient to confer general jurisdiction.

14. Venue is proper in this Court as the conduct giving rise to this action occurred in Escambia County, Florida.

15. The matter in controversy exceeds, exclusive of costs, Thirty Thousand Dollars ($30,000.00).

## II. STATEMENT OF FACTS

3

A.     **Background on Portable Fuel Containers, Flashback Explosions, and FMDs.**

16.     It is well-known that portable fuel containers can experience flashback explosions when the gas vapor escaping the container contacts a source of ignition, such as a flame or spark.[1] If the flame from the ignited vapor propagates (*i.e.*, flashes) back into the container and the gas and air vapor mixture inside the container is at a certain flammable concentration, the mixture inside can also ignite and cause an explosion.[2]

17.     Between 1998 and 2013, the Consumer Product Safety Commission ("CPSC") counted at least 11 deaths and 1,200 emergency room visits specifically involving gas can explosions during the pouring of gasoline.[3]

18.     A flame mitigation device (hereinafter "FMD") is a "device or feature attached to, installed in, or otherwise integral to, a [fuel] container that is expected to inhibit the propagation of an external flame into the container."[4] In essence, FMDs allow fuel to pass through the nozzle and fill opening of the container, while preventing flames from traveling back into the container.

19.     A common type of FMD used in portable fuel containers is a flame arrestor (a/k/a flame arrester, flash arresting screen, and/or spark arrestor).[5] A flame arrestor is a small, inexpensive metal screen, piece of mesh, or perforated disk placed at the fill opening of a portable fuel container that prevents a flame from traveling back into the container by absorbing

---

[1] Lisa Myers and Richard Gardella, "Warning: Scientists Say Gas Cans Carry Risk of Explosion," *NBC News*, Dec. 4, 2013 (https://www.cnbc.com/2013/12/04/warning-scientists-say-gas-cans-carry-risk-of-explosion.html) (last accessed Nov. 28, 2022).
[2] *Id.*
[3] *Id.*
[4] ASTM Standard F3429/F3429M-20, "Standard Specification for Flame Mitigation Devices Installed in Disposable and Pre-Filled Flammable Liquid Containers," ASTM International, West Conshohocken, PA, 2020, DOI: 10.1520/F3429_F3429M-20, www.astm.org.
[5] Other examples of FMDs include expanded metal mesh, bladders, and pumps.

4

and dispersing its heat energy.[6]

20. Flame arrestors are not new technology; the operating principle behind the device was discovered more than 200 years ago, and professional and commercial-grade gas cans have contained flame arrestors for over 100 years. Flame arrestors are also commonly used in water heaters, fuel tanks, gas pipelines, bottles of charcoal lighter fluid, and even bottles of overproof rum.

21. Likewise, for more than forty years, the Occupational Safety and Health Administration ("OSHA") has regulated a subclass of empty portable fuel containers known as "safety cans" for use in the workplace by requiring them to have spring-loaded or self-closing openings and flash-arresting screens and to be approved by a nationally recognized testing laboratory.[7]

22. Moreover, for more than a quarter century, the utility and efficacy of FMDs, specifically flame arrestors, have been a topic of discussion in the media and national publications, as well as the subject of numerous lawsuits filed by consumers, users, and bystanders who have been burned and/or killed in encounters with portable fuel containers that were not equipped with an FMD.

B. **Background on Defendants' Knowledge of Flashback Explosions and FMDs.**

23. For decades prior to the incident made the basis of this lawsuit, Defendants were engaged in the business of designing, developing, researching, testing, manufacturing, assembling, supplying, marketing, distributing, and/or selling portable fuel containers to U.S. consumers within the stream of commerce.

---

[6] NBC News Investigations, "Consumer panel calls for flame arresters on gas cans after NBC report," *NBC News*, Dec. 5, 2013 (https://www.nbcnews.com/news/world/consumer-panel-calls-flame-arresters-gas-cans-after-nbc-report-flna2d11701318) (last accessed Nov. 28, 2022).

[7] *See* 29 CFR § 1926.155(a) and (l).

5

24. For decades prior to the subject accident, Defendants also knew of the existence and safety value of FMDs and had actual subjective knowledge that portable fuel containers without FMDs were susceptible to flashback explosions.

25. Walmart had actual subjective knowledge of such explosions as far back as the early 1990s, through its involvement in lawsuits regarding portable fuel containers without FMDs manufactured by Rubbermaid, then again beginning in 2005, through its involvement in lawsuits involving portable fuel containers without FMDs manufactured by Blitz USA, Inc. (hereinafter "Blitz").[8]

26. Walmart undertook to determine whether portable fuel containers without FMDs were safe to use by consumers by conducting substantial research and testing on many different kinds of gas containers with and without FMDs. Ultimately, it concluded that portable fuel containers without FMDs were unsafe, defective, and unreasonably dangerous when used for their intended purpose, and that the warnings accompanying Scepter's portable fuel containers failed to adequately warn consumers and users of the defects.

27. Additionally, Walmart had actual knowledge from being a defendant in numerous lawsuits that portable fuel containers sold without FMDs were defective and unreasonably dangerous when used for their intended purpose. Walmart also knew from its testing and other actual knowledge that the warnings accompanying Scepter's portable fuel containers failed to adequately warn consumers and users of the defects stated above.

28. Despite a wealth of actual and subjective scientific knowledge, Walmart made a conscious decision to endanger the safety of consumers, users, and bystanders by continuing to

---

[8] Walmart sold more than 40 million Blitz portable fuel containers without FMDs between 2002 and 2013. In 2013, Walmart voluntarily agreed to contribute about $25M towards a $161M settlement fund to compensate victims of burn injuries between July 2007 and July 2012 caused by Blitz portable fuel containers without FMDs.

6

complicitly stock its shelves and otherwise sell portable fuel containers without FMDs to customers, including portable fuel containers manufactured by Scepter.

29. Scepter had actual subjective knowledge of flashback explosions at least as far back as 2007, when ASTM International[9] formed the F15.10 Subcommittee on Portable Fuel Containers to address the issue of burn injuries resulting from portable fuel containers. The chairman of the ASTM F15.10 Subcommittee was Philip Monckton, the former Vice President of Sales and Marketing for Scepter Canada Inc.

30. In 2008, after forming a task group to solicit proposals, the ATSM F15.10 subcommittee awarded a contract to Worcester Polytechnic Institute ("WPI") to study the conditions under which flashback explosions occur in portable fuel containers and the use of FMDs as a possible solution to such explosions. The research and testing performed by WPI were funded by the ASTM F15.10 subcommittee.

31. On November 9, 2011 Blitz sought relief under Chapter 11 of the United States Bankruptcy Code. Blitz's bankruptcy was caused, in part, by a growing number of personal injury lawsuits involving flashback explosions and Blitz's failure to include FMDs in its portable fuel containers.

32. On or about September 6, 2012, Scepter purchased Blitz's assets in Bankruptcy Court, including the machinery, building, and land associated with Blitz's sole manufacturing plant in Miami, Oklahoma. Scepter knew full well that Blitz's bankruptcy was largely due to personal injury lawsuits involving flashback explosions caused by Blitz portable fuel containers sold without FMDs.

---

[9] ASTM International (formerly known as American Society for Testing and Materials) is an international standards organization that develops and publishes voluntary consensus technical standards for a wide range of materials, products, systems, and services. *See* https://en.wikipedia.org/wiki/ASTM_International (last accessed Nov. 30, 2022).

7

33. In 2013, Scepter began manufacturing portable fuel containers at its new (Blitz's old) Miami, Oklahoma plant under the name Scepter Manufacturing, LLC. It expected the Miami plant to make 5-7 million portable fuel containers per year. Although Scepter's red plastic portable fuel containers were slightly different than Blitz's, the two designs did have one thing in common – neither contained an FMD. Scepter also continued to manufacture portable fuel containers at its original manufacturing plant in Scarborough, Ontario, where Scepter Canada Inc. is principally located.

34. In May 2013, the conclusions from the first phase of WPI's research and testing were published in *Fire Science Journal*.[10] Later that year, on December 4, 2013, an *NBC News* investigative report broadcasted on the *Today* show documented WPI's test results, the rise in personal injury litigation related to flashback explosions, and the common allegation in those lawsuits – that portable fuel containers were defective specifically because their design did not include a flame arrestor.[11]

35. In response to the *NBC News* investigation, the Consumer Product Safety Commission ("CPSC") issued a statement on or about December 5, 2013, calling for portable fuel container manufacturers to add flame arrestors to such containers to help prevent gasoline vapors from triggering flashback explosions.[12]

36. Scepter continued to manufacture and distribute its portable fuel containers without FMDs, despite WPI's test results and ongoing research (of which it had actual subjective knowledge based on Mr. Monckton's involvement on the ASTM F15.10 subcommittee) and the CPSC's 2013 statement. Likewise, Walmart continued to sell portable fuel containers without

---

[10] *See* Elias, B.E., et al., Portable gasoline container headspace flammability. Fire Saf. J. 58 (2013), 248–57.
[11] *See* Note 1.
[12] *See* Note 6.

8

FMDs, including but not limited to portable fuel containers manufactured by Scepter, until at least September 2016, when McCartney purchased the subject container from a Walmart retail store.

37. Finally, in February 2019, ASTM International published a new standard – ASTM F3326, *Standard Specification for Flame Mitigation Devices on Portable Fuel Containers* – requiring the addition of an FMD in consumer portable fuel containers. Consequently, Scepter began manufacturing its portable fuel containers with FMDs and additional warnings not found in/on its prior containers, like the one purchased by McCartney in September 2016.

38. Although ASTM F3326 is a voluntary standard, the performance standards set forth in the Portable Fuel Container Safety Act of 2020,[13] may soon see its current version (ASTM F3326-21) enforced as a consumer product safety rule promulgated under the Consumer Product Safety Act (15 U.S.C. § 2058).

C. **Facts Surrounding the Incident Made the Basis of This Lawsuit.**

39. McCartney purchased the subject container on or about September 19, 2016 from a Walmart retail store located at 3501 20th Avenue, Valley, Alabama 36854.

40. The relevant UPC (barcode) on the Walmart sales receipt confirms that the subject container was a red plastic 5-gallon portable fuel container manufactured by Scepter.

41. On the evening of October 8, 2019, McCartney was in the backyard of her house located at 11200 Gulf Beach Highway in Escambia County, Florida. It was chilly outside, so she decided to start a fire in the fire pit.

42. McCartney did not have any fire starter logs (it was the first fire of the season), so

---

[13] *See* 15 U.S.C. § 2056d(b)(3)-(4).

9

she placed kindling and leaves in the fire pit instead. McCartney attempted to light the contents in the fire pit with a grill lighter, but the kindling and leaves did not appear to catch fire, so she went to the garage to retrieve the subject container of gasoline.

43. Believing the contents of the fire pit had not ignited from the lighter, McCartney began to pour a small amount of gasoline onto the kindling and leaves.

44. McCartney was unaware that the subject container did not contain an FMD or that it could have been sold with such a device, nor was she aware of the need for an FMD or that the subject container's vapor trail could ignite and cause a flashback explosion.

45. Suddenly, McCartney heard a loud "whoosh," saw bright light flash all around her, and heard a loud "boom." The gasoline vapor trail from the subject container ignited and traveled back into the container, causing it to violently explode and spray burning gasoline onto McCartney.

46. The next thing McCartney saw was fire on the ground all around her. She looked down and the subject container, still in her left hand, was also on fire. McCartney jumped in the pool with the subject container still in her hand, hoping it would extinguish the flames engulfing her.

47. Once in the pool, McCartney looked around and noticed that patches of the pool were now on fire, along with the subject container. McCartney got out of the pool, grabbed a nearby watering hose and extinguished the fire in the pool and backyard.

48. Still in shock, McCartney then went into her house, where she was met by her husband, who rushed her to West Florida Hospital's Perdido Bay ER. From there, she was transferred to USA Medical Center in Mobile, Alabama, where she spent approximately 55 days in the burn intensive care unit.

49. As a direct and proximate result of the subject accident, McCartney was caused to suffer severe and permanently disabling injuries and damages, including but not limited to:

   a. second degree burns covering over 50% of her total body surface area, skin grafting, debridement procedures, infection, and surgical interventions;

   b. severe physical pain and suffering – past, present, and future;

   c. physical disability, permanent scarring, impairment, and disfigurement – past, present, and future;

   d. mental anguish, stress, anxiety, frustration, emotional distress, and psychological trauma – past, present, and future;

   e. loss of normal life expectancy;

   f. loss of normal enjoyment of life – past, present, and future;

   g. lost income and loss of future earning capacity;

   h. hospital, nursing, rehabilitation, and other medical and/or healthcare-related bills and expenses – past, present, and future; and

   i. out-of-pocket expenses – past, present, and future.

50. The subject container manufactured by Scepter and sold by Walmart was defective and unsafe for its intended purposes at the time it left Defendants' control in that the container lacked any form of FMD, a necessary safety device that would have prevented the flashback ignition in the subject container's headspace and McCartney's resulting injuries.

51. Prior to McCartney's accident, Defendants knew or should have known that consumer portable fuel containers lacking FMDs were susceptible to flashback explosions.

### III. CAUSES OF ACTION

### Count One: Strict Liability Against Scepter

52. McCartney adopts and incorporates the allegations in the preceding paragraphs, as if fully set forth herein, and further alleges that:

11

53. Scepter is engaged in the for-profit business of designing, manufacturing, assembling, testing, inspecting, marketing, distributing, and/or selling portable fuel containers throughout the United States, including the State of Florida, for use by individual consumers, including McCartney. Scepter designed, manufactured, assembled, tested, inspected, marketed, distributed, and/or sold the subject container.

54. The subject container was unreasonably dangerous because it was defectively designed. It was foreseeable to Scepter that consumers and users would suffer the same or similar injury suffered by McCartney if ignited gasoline vapors propagated back into the container and caused a flashback explosion. This danger was not designed-out of the container, nor did Scepter incorporate a flame arrestor or other FMD to protect against this danger.

55. The subject container was unreasonably dangerous because it was defectively manufactured. Specifically, the container was not equipped with a flame arrestor or other FMD to prevent gasoline vapors from triggering a flashback explosion.

56. The subject container was unreasonably dangerous because there were no warnings on the container or in the instructions accompanying it that adequately warned consumers and users that Scepter's portable fuel containers lacked FMDs and might explode if ignited vapors flashed back into the container.

57. These defects were present in the subject container when it was manufactured, assembled, and sold by Scepter. The subject container was expected to, and did, reach McCartney without substantial change in its condition. The subject container was not altered or changed in any material way and remained in substantially the same condition when McCartney used it on October 8, 2019 as when it left the possession of Scepter.

58. McCartney used the subject container in a way that was foreseeable to Scepter.

12

The manner in which McCartney was injured was also foreseeable to Scepter.

59.     The subject container, as designed, manufactured, assembled, tested, inspected, marketed, distributed, and/or sold by Scepter was neither merchantable nor reasonably suited to its intended purpose in the following respects:

    a.  the risk of severe and life threatening injury associated with defects in the subject container rendered the product inherently dangerous in its design, outweighing any utility it may have had, and

    b.  Scepter knew, or should have known, that the subject container was and is a dangerously defective product that poses an unacceptable risk to the health and lives of the unknowing consumer public at large.

60.     When the subject container was designed, manufactured, and sold by Scepter, there were safer alternative designs that would have alleviated the above defects and prevented the risk of injury without substantially impairing the utility of the subject container. Most prominently, the incorporation of a flame arrestor or other FMD would have alleviated the risk of harm. This and other safer alternative designs were economically and technologically feasible when the subject container left the control of Scepter under then-existing or reasonably achievable scientific knowledge and plain common sense.

61.     The defects in the subject container were the direct and proximate cause of McCartney's severe and catastrophic burn injuries and other damages set forth in paragraph 49(a)-(i). These injuries and damages would have been prevented if the subject container had not been defective and unreasonably dangerous.

### Count Two: Negligence/Wantonness Against Scepter

62.     McCartney adopts and incorporates the allegations in the preceding paragraphs, as if fully set forth herein, and further alleges that:

63.     The standard of care imposed a duty on Scepter to design, manufacture, assemble,

13

test, inspect, market, distribute and/or sell portable fuel containers, including the subject container, in a reasonably safe manner.

64. Scepter and its employees negligently/wantonly breached that duty in the following respects:

    a. by designing, manufacturing, and selling portable fuel containers, including the subject container, without a flame arrestor or other FMD when it knew, or should have known, that such containers were unreasonably dangerous and unsafe for use;

    b. by designing, manufacturing, and selling portable fuel containers, including the subject container, with inadequate and unreadable warnings and/or instructions as to hazards and/or risks involving ignited gasoline vapors propagating back into the container and causing explosions;

    c. by failing to guard against hidden or latent defects;

    d. by failing to include explosion suppression material in the product design;

    e. by failing to include FMDs in its portable fuel containers, despite the economic feasibility of including such a device;

    f. by knowing or having reason to know that the subject container was dangerous for its intended use;

    g. by failing to exercise that degree of care that a reasonably prudent manufacturer would have exercised under the same or similar circumstances;

    h. by intentionally and knowingly failing to take proper precautions to make its portable fuel containers safe, despite knowledge of the aforementioned dangers; and

    i. by otherwise being negligent, reckless, willful, and wanton as will be revealed through discovery.

65. The foregoing negligent/wanton conduct of Scepter and its employees was the direct and proximate cause of McCartney's severe and catastrophic burn injuries and other damages set forth in paragraph 49(a)-(i). These injuries and damages would have been prevented if Scepter and its employees acted with reasonable care.

66. Scepter is vicariously liable for the torts committed by its employees in the course and scope of their employment under the doctrine of *respondeat superior*.

### Count Three: Strict Liability Against Walmart

67. McCartney adopts and incorporates the allegations in the preceding paragraphs, as if fully set forth herein, and further alleges that:

68. Walmart is engaged in the for-profit business of marketing, distributing, and/or selling portable fuel containers throughout the United States, including the State of Florida, for use by individual consumers, including McCartney. Walmart distributed and/or sold the subject container.

69. The subject container was unreasonably dangerous for the reasons set forth in paragraph 54-56. These defects were present in the subject container when it was sold by Walmart.

70. The subject container was expected to, and did, reach McCartney without substantial change in its condition. The subject container was not altered or changed in any material way and remained in substantially the same condition when McCartney used it on October 8, 2019 as when it was sold by Walmart.

71. McCartney used the subject container in a way that was foreseeable to Walmart. The manner in which McCartney was injured was also foreseeable to Walmart.

72. The subject container, as distributed and/or sold by Walmart, was neither merchantable nor reasonably suited to its intended purpose in the following respects:

    a. the risk of severe and life threatening injury associated with defects in the subject container rendered the product inherently dangerous in its design, outweighing any utility it may have had, and

    b. Walmart knew, or should have known, that the subject container was and is a dangerously defective product that poses an unacceptable risk to the

health and lives of the unknowing consumer public at large.

73. When Walmart sold the subject container, there were safer alternative designs that would have alleviated the above defects and prevented the risk of injury without substantially impairing the utility of the subject container. Most prominently, the incorporation of a flame arrestor or other FMD would have alleviated the risk of harm. This and other safer alternative designs were economically and technologically feasible when Walmart sold the subject container under then-existing or reasonably achievable scientific knowledge and plain common sense.

74. The defects in the subject container were the direct and proximate cause of McCartney's severe and catastrophic burn injuries and other damages set forth in paragraph 49(a)-(i). These injuries and damages would have been prevented if the subject container had not been defective and unreasonably dangerous.

### Count Four: Negligence/Wantonness Against Walmart

75. McCartney adopts and incorporates the allegations in the preceding paragraphs, as if fully set forth herein, and further alleges that:

76. The standard of care imposed a duty on Walmart to market, distribute, and/or sell portable fuel containers, including the subject container, in a reasonably safe manner.

77. Walmart and its employees negligently/wantonly breached that duty in the following respects:

    a. by selling portable fuel containers, including the subject container, without a flame arrestor or other FMD when it knew, or should have known, that such containers were unreasonably dangerous and unsafe for use;

    b. by selling portable fuel containers, including the subject container, with inadequate and unreadable warnings and/or instructions as to hazards and/or risks involving ignited gasoline vapors propagating back into the container and causing explosions;

    c. by knowing or having reason to know that the subject container was

          dangerous for its intended use;

    d.    by failing to exercise that degree of care that a reasonably prudent seller would have exercised under the same or similar circumstances;

    e.    by failing to properly perform independent testing of portable fuel containers and/or failing to respond to the results of such testing in a reasonably prudent manner;

    f.    by intentionally and knowingly failing to take proper precautions in selling portable fuel containers, despite knowledge of the aforementioned dangers; and

    g.    by otherwise being negligent, reckless, willful, and wanton as will be revealed through discovery.

78.    The foregoing negligent/wanton conduct of Walmart and its employees was the direct and proximate cause of McCartney's severe and catastrophic burn injuries and other damages set forth in paragraph 49(a)-(i). These injuries and damages would have been prevented if Walmart and its employees acted with reasonable care.

79.    Walmart is vicariously liable for the torts committed by its employees in the course and scope of their employment under the doctrine of *respondeat superior*.

### Count Five: Breach of Warranties Against All Defendants

80.    McCartney adopts and incorporates the allegations in the preceding paragraphs, as if fully set forth herein, and further alleges that:

81.    Defendants impliedly warranted that the subject container was (a) reasonably fit and suitable for the purposes for which it was intended to be used, (b) free of defects, and (c) of merchantable quality. Defendants breached said warranties because the subject container was subject to explosion when being used for its ordinary and foreseeable purpose – *i.e.*, to pour gasoline. Defendants also breached said warranties because the subject container was <u>not</u> (a) reasonably fit or suitable for the purposes for which it was intended to be used, (b) free of

defects, and (c) of merchantable quality.

82. The subject container was in substantially the same condition when McCartney used it on October 8, 2019 as when it left Defendants' possession.

83. Defendants' breach of warranties directly and proximately injured and damaged McCartney as set forth in paragraph 49(a)-(i). These injuries and damages would have been prevented if Defendants had not breached their warranties.

## IV. RELIEF REQUESTED

84. Based on the foregoing, McCartney prays for judgment in her favor and against Defendants for the harm caused by Defendants' wrongful conduct as follows:

    a.    That process issue according to law;

    b.    For actual damages according to proof;

    c.    For compensatory damages as permitted by law;

    d.    For all costs of Court; and

    e.    For such other relief deemed just and proper.

Additionally, McCartney requests that the Court enter judgment consistent with the verdict, and award her interest from the date of the judgment.

## V. JURY DEMAND

85. McCartney demands a trial by struck jury on all triable issues of fact.

    Respectfully submitted,

    */s/ Rachael R. Gilmer*
    Rachael R. Gilmer
    LEVIN PAPANTONIO RAFFERTY PROCTOR
    BUCHANAN O'BRIEN BARR MOUGEY, P.A.
    316 South Baylen Street | Pensacola, FL 32502
    T: (850) 435-7000 | rgilmer@levinlaw.com
    **Counsel for Plaintiff Nan Morgan McCartney**

## REQUEST FOR SUMMONS AND SERVICE BY CERTIFIED MAIL

Having paid the appropriate fees and costs, Plaintiff respectfully requests the Clerk of the Court immediately issue summonses for the following defendants and to immediately serve them with a summons and this document by certified U.S. Mail as follows:

**Myers Industries, Inc.**
c/o CT Corporation System – Registered Agent
4400 Easton Commons Way, Suite 125
Columbus, OH 43219

**Scepter US Holding Company**
c/o CT Corporation System – Registered Agent
4400 Easton Commons Way, Suite 125
Columbus, OH 43219

**Scepter Manufacturing, LLC**
c/o The Corporation Trust Company – Registered Agent
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**Scepter Canada Inc.**
c/o CT Corporation System (Canada), Ltd. – Registered Agent
400-1565 Carling Avenue
Ottawa ON  K1Z 8R1
CANADA

**Walmart Inc.**
c/o CT Corporation System – Registered Agent
1200 South Pine Island Road
Plantation, FL 33324

**Wal-Mart Stores East, LP**
c/o CT Corporation System – Registered Agent
1200 South Pine Island Road
Plantation, FL 33324